## AFFIDAVIT OF WILLIAM C. WISE

Your Affiant, William C. Wise, being duly sworn, deposes and states as follows:

1. I, William C. Wise, am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice. I have been so employed for the past 16 years. In connection with my official DEA duties, I investigate criminal violations of the federal narcotics laws, including but not limited to, Title 21, United States Code, Sections 841, 843, 846, and 848. I have also been involved in various types of electronic surveillance, and in the debriefing of defendants, witnesses, informants, and others who have knowledge of narcotics trafficking, and of the laundering and concealing of proceeds of drug trafficking for the past 16 years. I have received specialized training in the enforcement of laws concerning the activities of narcotics traffickers including four months of DEA basic training in Quantico, Virginia as well as periodic refresher training offered by the DEA. I am currently assigned to the Chattanooga Resident Office. My current assignment involves investigations of high-level drug trafficking organizations operating in eastern Tennessee, north Georgia, and elsewhere. Prior to my employment with the Drug Enforcement Administration, I was employed as an Arlington County Police Officer for approximately 5 years and 6 months in Arlington, Virginia. As a result of my training and experience, I am familiar with how various controlled substances are used and the typical distribution and trafficking patterns generally utilized by drug dealers and traffickers.

1

2. This affidavit is submitted in support of an application for a search and seizure warrant for the residence of Kevin HYATTE located at 5216 Donlyn Lane #A, Hixson, Tennessee 37343, further described in Attachment A of this affidavit.

3. The information contained in this affidavit is based on my own personal observations and information related directly to your Affiant by other law enforcement officers. This affidavit does not include each and every fact known to your Affiant but rather contains sufficient facts to establish probable cause to support the search warrant application and order.

4. Based upon your Affiant's training, experience, and participation in investigations involving large amounts of controlled substances, your Affiant knows:

   a. That drug traffickers very often place assets in names other than their own to avoid detection of these assets by government agencies;

   b. That drug traffickers very often place assets in corporate entities in order to avoid detection of these assets by government agencies;

   c. That even though these assets are in other persons' names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them;

   d. That large-scale narcotics traffickers may maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business;

   e. That narcotics traffickers maintain books, records, receipts, notes ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That narcotics traffickers

2

commonly "front" (provide narcotics on consignment) controlled substances to their clients; that the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the traffickers have ready access to them;

f.  That it is common for large-scale drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residence, their businesses and/or other locations which they maintain dominion and control over, for ready access and to conceal these items from law enforcement authorities;

g.  That, in order to accomplish this concealment, narcotics traffickers frequently build "stash" places within their residences or businesses. That there are a number of publications available instructing where and how to build "stash" places. Copies of these types of publications have been found in the residences of narcotics traffickers;

h.  That it is common for persons involved in large-scale narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences, businesses or other locations which they maintain dominion and control over;

3

i. That large-scale traffickers often utilize electronic equipment such as computers, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, records and/or store the information described above;

j. That when drug traffickers amass large proceeds from the sale of drugs that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize, including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals such as attorneys, and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

k. That the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money");

l. That it is common for drug dealers to physically handle and count the "street money" after receiving it in exchange for the controlled substances, thereby leaving residue traces of controlled substances on the "street money." That law enforcement agencies own dogs which are trained to react to the scent of controlled substances and residue traces of controlled substances; and that those trained dogs have reacted to narcotics tainted currency negotiated at banks and concealed in the residences of narcotics traffickers;

m. That the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled,

4

carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and narcotics transactions;

n. That the Currency Transaction Report (CTR) (IRS form 4789), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000 causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution;

o. That, in order to evade the filing of a CTR, narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

p. That narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses;

5

q.  That controlled substances traffickers commonly maintain addresses of telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

r.  That drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product and that these traffickers usually maintain these photographs in their possession;

s.  That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

t.  That drug traffickers commonly have in their possession, that is on their person, at their residences and/or their businesses, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Said firearms are used to protect and secure a drug trafficker's property. Such property may include, but is not limited to: narcotics, jewelry, narcotics paraphernalia, books, records and U.S. currency;

u.  That drug traffickers frequently use cellular telephones and keep a list of names and numbers of customers and suppliers in their electronic address books of their cellular telephones. Such cell phones will also carry information in a SIM (Subscriber Identity Module) card, or some other type of electronic storage card, which will reveal the number of the cell phone and other information, leading to the identity of the user.

## FACTS ESTABLISHING PROBABLE CAUSE

5. Since approximately April 2015, the DEA, Hamilton County Sheriff's Office and other federal, state, and local law enforcement agencies have been involved in an investigation involving Heather ROBINSON and Jovani ROBINSON. Through this investigation Heather ROBINSON and Jovani ROBINSON have been identified as significant distributors of heroin in north Georgia and east Tennessee. Kevin HYATTE has been identified as a customer of Heather ROBINSON and Jovani ROBINSON who purchased distribution quantities of heroin.

6. During the course of this investigation, law enforcement confirmed, through physical surveillance and interviews with confidential sources that HYATTE has lived at 5216 Donlyn Lane #A, Hixson, Tennessee from at least May 2016 until the present. A check of public/law enforcement databases for the address of 5216 Donlyn Lane #A, Hixson, Tennessee, revealed that Kevin HYATTE was associated with this residence between December 2015 and August 2016.

7. Based on my training and experience, evidence of drug sales, such as books, records, letters of credit, and electronic media, are likely to be found where drug traffickers live. That is to say, evidence of drug trafficking is likely to be found in the residence of a drug dealer. Drug proceeds and other indicia of drug trafficking such as coded telephone numbers, photographs and firearms are often secreted in safe places such as homes.

### Information Received from Confidential Source 1

8. From August 2015 until approximately August 2016, law enforcement officers have worked closely with a Confidential Source, hereinafter referred to a CS-1, and have independently

7

corroborated a substantial amount of information provided by CS-1. A substantial portion

of the information provided by CS-1 has been corroborated by independent investigation,

including controlled purchases of narcotics, physical surveillance of targets identified by

CS-1, the review of federal, state, and local law enforcement documents, interviews of

other members of the above-stated drug trafficking organization, and telephone record

analyses. Information provided by CS-1 has been used in submissions for wiretaps

submitted as part of this investigation. For these reasons, I consider CS-1 to be reliable.

9. CS-1 has been interviewed by law enforcement officers on numerous occasions. In those

interviews, CS-1 stated that in the spring of 2015, CS-1 was introduced to Marlon

EBERHARDT through Jovani and Heather ROBINSON. CS-1 stated that EBERHARDT

identified himself as a "Prince" in the Vice Lords street gang, and that Heather ROBINSON

identified herself as a Ghost Insane Vice Lords gang member.

10. CS-1 related to law enforcement that EBERHARDT has heroin sources of supply in Chicago,

Illinois, Nashville, Tennessee, and Atlanta, Georgia. CS-1 stated that Heather ROBINSON

and Jovani ROBINSON are distributors for EBERHARDT and frequently accompany

EBERHARDT on trips to obtain heroin from EBERHARDT's sources. CS-1 stated that

EBERHARDT frequently pays females to accompany him on these trips. CS-1 identified

Shayna GRISSOM, Kaitlyn CORBETT, Shelby FRYAR, and Farrah WESTMORELAND as persons

EBERHARDT has paid to accompany him when he obtained heroin from his sources of

supply. CS-1 related that EBERHARDT would use the females to conceal the heroin on their

person in case they were stopped by law enforcement. CS-1 stated that EBERHARDT

typically pays the females $100.00 to $200.00 or with heroin. In approximately

8

March/April 2015, CS-1 personally accompanied EBERHARDT, Jovani ROBINSON, and Heather ROBINSON on one of the trips to Chicago, Illinois, during which CS-1 observed EBERHARDT and Jovani ROBINSON obtain approximately one kilogram of heroin from a later identified source of supply for approximately $30,000.00.

11. CS-1 stated that Jovani and Heather ROBINSON distribute heroin for EBERHARDT and store heroin obtained from EBERHARDT at their residences. CS-1 stated that EBERHARDT also weighs and re-packages heroin at Jovani and Heather ROBINSON's residences. During the course of this investigation, CS-1 has identified multiple different places that Jovani and Heather ROBINSON have resided at, including 1306 Preston Street, Chattanooga, Tennessee, 4835-A Lavender Trail, Hixson Tennessee, and 91 Lee Edwards Drive, Lafayette, Georgia. CS-1 has observed large quantities of heroin and large sums of currency at the Tennessee residences listed above as recent as October 2015, and smaller amounts of heroin at the Lafayette, Georgia residence as recent as April 16, 2016. CS-1 also stated that CS-1 has observed Heather ROBINSON distribute heroin from each of these residences. CS-1 stated that Heather ROBINSON distributes approximately $2,000.00 worth of heroin a day.

12. CS-1 related that between April and May 2016, CS-1 travelled to Covington, Georgia with Brandon MOORE on approximately three occasions to obtain heroin and cocaine. CS-1 stated that the first trip with MOORE occurred on or about April 19, 2016 and that Heather ROBINSON requested CS-1 travel with MOORE on that occasion. In June 2016, law enforcement officers and CS-1 identified the above-referenced residence as 210 Stonecreek Parkway, Covington, Georgia. While at the residence, law enforcement officers

9

and CS-1 observed a black male in the driveway of the residence. At that time, CS-1 identified the black male as MOORE's source of supply. Law enforcement officer subsequently obtained a photograph of Percy RICHARD and positively identified the above-referenced black male as RICHARD.

13. CS-1 related that on each of these trips, MOORE brought a large sum of currency with him. After arriving at RICHARD's residence, CS-1 would wait in the vehicle while MOORE entered the residence with the currency. MOORE would later return to his vehicle with narcotics and MOORE and CS-1 would then drive back to Tennessee. CS-1 related that MOORE would typically obtain three packages each containing heroin or cocaine.

14. CS-1 also related that MOORE told CS-1 that Marlon EBERHARDT typically sent $5,000.00 with MOORE to obtain heroin from RICHARD and that some of the heroin obtained from RICHARD was intended for EBERHARDT. MOORE has also told CS-1 that MOORE and EBERHARDT had travelled together to RICHARD's residence to obtain narcotics.

**Information Received from Confidential Source 3**

15. Between April 2016 and approximately May 2016, CS-3 was interviewed in-person and over the telephone by detectives of the Hamilton County Sheriff's Office and by DEA on numerous occasions.

16. A substantial portion of CS-3's information has been corroborated by independent investigation, including controlled purchases of narcotics, consensually recorded telephone calls, physical surveillance, and the review of DEA documents as well as other federal, state, and local documents, interviews of other members of the above-stated drug

10

trafficking organization, and telephone record analyses. Information provided by CS-3 has been used in submissions for pen registers and wiretaps submitted as part of this investigation. The information provided by CS-3 has resulted in the seizure of heroin. For these reasons, I consider CS-3 to be reliable.

17. CS-3 has provided the following information. CS-3 identified EBERHARDT as CS-3's heroin source of supply. CS-3 stated that in August 2015, CS-3 was purchasing four grams of heroin for $1,000.00 from Curtis BROOKS Jr. every other day. CS-3 stated that this lasted several months until CS-3 was introduced to Jovani and Heather ROBINSON. CS-3 stated that CS-3 then began being supplied heroin by Jovani and Heather ROBINSON. CS-3 stated that CS-3 would purchase ten grams of heroin from Jovani and Heather ROBINSON every four days for $2,000.00. CS-3 stated that CS-3 continued purchasing heroin from Jovani and Heather ROBINSON for several months until Heather ROBINSON "shorted" him. Your Affiant is aware that "shorted" is a reference to the weight of the heroin being less than what CS-3 paid for.

18. CS-3 stated that Jovani and Heather ROBINSON's source of supply was EBERHARDT. CS-3 stated that CS-3 contacted EBERHARDT via Facebook messenger and arranged to meet EBERHARDT in January 2016. CS-3 then began purchasing 10 grams of heroin directly from EBERHARDT every two days for $2,000.00.

**Tracking Device Analysis**

19. Between March 24, 2016 and approximately May 4, 2016, vehicle tracking devices were installed on two vehicles rented by a confidential source and utilized by Heather

11

ROBINSON. The data obtained from the devices showed that Heather ROBINSON travelled to the Chattanooga, Tennessee area on 28 of the 41 days analyzed. More specifically, the device showed that Heather ROBINSON frequently traveled to known residences used by customers of the organization. For example, the vehicles used by Heather ROBINSON traveled to 5216 Donlyn Lane, Chattanooga, Tennessee on fifteen occasions. This residence has been associated with Kevin HYATTE, an identified heroin distributor.

**Interview of Brooke Lee**

20. On May 9, 2016, a consensual interview of Brooke LEE was conducted by DEA in reference to the overdose death of James Correll on May 9, 2016. During the interview, LEE identified Kevin HYATTE as a heroin source of supply. LEE stated that on May 8, 2016, she and James Correll went to 5216 Donlyn Lane, Hixson, Tennessee to purchase heroin from HYATTE. LEE stated that after arriving to the residence, she went to the right side of the house and subsequently entered the residence after HYATTE answered the door. LEE stated that she purchased two points (2/10[th] gram) of heroin from HYATTE for approximately $50.00. LEE stated that HYATTE weighed and packaged the heroin in the kitchen area of the residence. LEE stated that after leaving the residence, she and Correll used one point (1/10[th] gram) of the heroin purchased from HYATTE and later returned to their residence. LEE stated that sometime during that night, Correll died.

**Authorized Wiretaps**

21. On June 14th, 2016, the Honorable Judge Travis R. McDonough, United Stated District Court Judge, Eastern District of Tennessee, signed an order granting authorization for the initial interception of electronic and wire communications of telephone number 423-400-

12

5184, hereinafter Target Telephone #2. Target Telephone #2 is a cellular telephone utilized by Heather ROBINSON and Jovani ROBINSON. Interceptions of Target Telephone #2 commenced on June 14, 2016. Monitoring of Target Telephone #2 has terminated.

22. On July 13, 2016, the Honorable U.S. District Court Judge, Travis R. McDonough, Eastern District of Tennessee signed an order granting authorization for the continued interception of electronic and wire communications of telephone number 423-771-5311, hereinafter Target Telephone #3, used by Heather and Jovani ROBINSON. The continued interception of Target Telephone #3 commenced on July 14, 2016. Monitoring of Target Telephone #3 terminated on August 2, 2016.

23. On July 13, 2016, the Honorable U.S. District Court Judge, Travis R. McDonough, Eastern District of Tennessee signed an order granting authorization for the interception of electronic and wire communications of telephone number 423-680-9551, hereinafter Target Telephone #5, used by Marlon EBERHARDT. Interception of Target Telephone #5 commenced on July 14, 2016. Monitoring of Target Telephone #5 terminated on July 26, 2016.

**Intercepted Communication Relating Kevin Hyatte**

24. On June 21, 2016, at approximately 10:41 a.m., Target Telephone #2, utilized by Heather and Jovani ROBINSON, sent an outgoing text message to telephone number 423-463-7533, utilized by Kevin HYATTE, stating, "U ain't fuckin wit me anymore on dat tip?" Target Telephone #2 received a response text message stating, "Money been tied up tying to get my car plus people been getting on my nerves bad just quick for a while that's all." Target Telephone #2 then sent an outgoing text message stating, "Ok so u gone be back soon

13

or???" and "Joe said tell u it's back on point so ull make more cuz he is back in charge. He gets a better price than I do."

25. Based on my training and experience, and knowledge acquired during the course of this investigation, in these text messages Heather ROBINSON was contacting HYATTE to see if he needed heroin and related to HYATTE that HYATTE could make more money because she and Jovani ROBINSON were getting the heroin at a cheaper price. HYATTE related to Heather ROBINSON that he did not have money at the moment and had quit for a while.

26. On June 22, 2016, at approximately 4:46 p.m., Target Telephone #2 sent an outgoing text message to telephone number 423-463-7533, utilized by HYATTE, stating, "I am in the A now I will be back in just a little while! Perfect timing lol what u need." Target Telephone #2 received a response text message stating, "One." Based on my training and experience, and knowledge acquired during the course of this investigation, in this text message Kevin HYATTE told Heather and Jovani ROBINSON that he needed one gram of heroin. Based on my training and experience, one gram of heroin is a resale quantity.

27. On June 27, 2016, at approximately 8:23 p.m., Target Telephone #2 received an incoming text message from telephone number 423-463-7533, utilized by HYATTE, stating, "I need one." At approximately 10:44 p.m., Target Telephone #2 sent an outgoing text message to telephone number 423-463-7533 stating, "On mi way please have the money and bench ready." Based on my training and experience, and knowledge acquired during the course of this investigation, in this text message Heather ROBINSON was telling HYATTE that she would meet HYATTE at his residence to sell him heroin. Heather ROBINSON further

14

instructed HYATTE to have his money and "bench," ready. Your Affiant is aware that "bench" is a reference to a scale to weigh narcotics.

28. On June 29, 2016, Target Telephone #2 received an incoming call from telephone number 423-463-7533, utilized by HYATTE. During the call, Heather ROBINSON asked HYATTE if he needed her. HYATTE responded, "Yeah. You in town." Heather ROBINSON replied, "Yeah." HYATTE then stated, "Yeah I do. I do. I need 1.5." Based on my training and experience, and knowledge acquired during the course of this investigation, in this call HYATTE told Heather ROBINSON that he wanted to purchase 1.5 grams of heroin. Based on my training and experience, 1.5 grams of heroin is a resale quantity.

**Seizure of Heroin and Cocaine from Marlon Eberhardt and Farrah Westmoreland on July 26, 2016**

29. On July 24, 2016, at 9:51 p.m., Target Telephone #3, utilized by Heather and Jovani ROBINSON, received an incoming telephone call from 423-413-8146, utilized by WESTMORELAND. During this call, Heather ROBINSON and WESTMORELAND discuss money amounts and who gave who money. At one point, Marlon EBRHARDT gets on the phone and says, "I ain't pissed off or anything like that I was just saying you know I was just letting it be known you know what I'm saying?" and Heather ROBINSON responds, "Yeah" and "Yeah, I understand we'll have it. I promise just call us when you get back and we'll give it to you." During this call, the participants were appearing to be gathering money to re-supply with drugs at some point in the near future. Based on my training and experience, and knowledge acquired during the course of this investigation, Heather ROBINSON related to EBERHARDT that she and Jovani ROBINSON would give EBERHARDT the additional money they owe him when he returned with a new supply of heroin.

15

30. At 10:02 p.m., Target Telephone #3 received an incoming telephone call from 423-413-8146, utilized by WESTMORELAND. During this call, WESTMORELAND said, "Then he would never, he said he would never talk to me again or ever deal with me again. He said he didn't want me to tell you, didn't want me to tell nobody that he's not going till tomorrow. That he needs me to take him tomorrow so." Heather ROBINSON then said, "He probably didn't want you to tell me that because you're gonna have to tell me on the phone and he's scared to death. I promise I won't say anything and he won't either."
Later, WESTMORELAND said, "He said he was also a hundred dollars short too, so." and later, Heather ROBISNON said, "Yeah, he's just he's lost in the sauce. It's crazy that I got my Joe back 100% he's not on dope he's really being who I need him to be and then my husband's boss turns into who Joe was. Now he's a whole swang worse now he's doing some serious shit." and "But I am glad that you're the one taking him cause if you're the one taking him, he don't know this cause you're not supposed to tell him, but we know everything. When you're back we know you're back so we know if he's fixing to fuck us over or not so we can be prepared." During this call, the participants were appearing to be discussing EBERHARDT, being driven by WESTMORLEAND, going to re-supply with drugs at some point in the near future.

31. At 1:18 p.m., Target Telephone #3 sent a text to 423-413-8146, utilized by WESTMORELAND, stating, "We gotta come up on $500 or we can't get shit. Marlon is $500 short. He can't know I'm borrowing it from u or he will start harassing you all the time."

32. At 4:52 p.m., Target Telephone #3 made an outgoing telephone call to 423-413-8146, utilized by WESTMORELAND. During this call, Heather ROBINSON stated, "Guap said to call

16

him and pull up on him", "Marlon is up and he just called the "dude", and "Pick up Marlon and take him". Farrah said she is "so sick". Heather ROBINSON stated they were digging in the drawer where they drop the bags to try to find some for her. During this call, Heather ROBISNON wanted WESTMORELAND to pick up some marijuana from "Guap" and then WESTMORELAND was to get EBERHARDT and take him to meet "dude". WESTMORELAND complained about being sick from not having any heroin. Agents believe "dude" is Percy RICHARD.

33. At 9:23 p.m., Target Telephone #3, utilized by Heather and Jovani ROBINSON, received a text from 423-413-8146, utilized by WESTMORELAND. The text stated, "we are leaving" and Target Telephone #3 responded with, "Yessss!!!! I love u so much and I'm so sorry u had to Go thru this. I'm hiding 3 bags from Joe when u get back so u can buy them while u take the next run." Target Telephone #3 then sent another text message asking, "Also did Marlon mention the money's?" and WESTMORELAND responded, "he asked if i had any money that yall was gonna send wjth me." During these communications WESTMORELAND appeared to be relating to Heather ROBINSON that she was leaving with EBERHARDT to meet EBERHARDT's source of supply. Heather ROBINSON then told WESTMORELAND that she would reserve three bags of heroin for WESTMORELAND to buy between their re-supply trips.

34. On July 25, 2016, at approximately 7:02 p.m., Target Telephone #3 made an outgoing telephone call to HYATTE at telephone number 423-463-7533. During the call, Heather ROBINSON stated, "Kevin, hey this Heather." Heather ROBINSON later stated, "I don't got nothing and my friend is sick. Can she come to you. My same friend that came to you

17

before to bring you money." HYATTE replied, "I don't have anything." HYATTE later stated, "All I gots is Xanax." Agents believe that in this call, Heather ROBINSON asked HYATTE if he had heroin because her friend, Farrah WESTMORELAND, was sick. Heather ROBINSON stated that her friend was the same person that previously delivered money to HYATTE in the past indicating that HYATTE has supplied Heather ROBINSON with narcotics in the past. HYATTE then related that he had Xanax pills for sale.

35. On July 26, 2016, at 12:02 a.m., Target Telephone #3, utilized by Heather and Jovani ROBINSON, received a text from 423-413-8146, utilized by WESTMORELAND stating "im omw to his house." At 12:18 a.m., surveillance observed WESTMORELAND leaving Taco Bell and followed her to 6612 Flagstone Drive, Ooltewah, Tennessee, the residence of EBERHRADT. WESTMORELAND was driving her black Infinity Q-70S Sports Utility Vehicle (SUV) bearing Tennessee license plate R59-13N. At 12:36 a.m., Target Telephone #3, utilized by Heather and Jovani ROBINSON, received another text from 423-413-8146, utilized by WESTMORELAND stating, "he on his way out." At 12:45 a.m., surveillance observed EBERHARDT leaving his residence and getting into WESTMORELAND's vehicle. Surveillance was maintained on EBERHARDT and WESTMORELAND.

36. At 1:05 a.m., Target Telephone #5, utilized by EBERHARDT, made an outgoing telephone call to 423-4*you*3-7533, utilized by Kevin HYATTE. During this call, EBERHARDT identified himself as "Marlon" and said, "Yeah I'm still waiting on dude to bring me this other money man this motherfucker ain't never bring it man". HYATTE replied, "Oh okay" and EBERHARDT said, "As soon as I get out man I'm finna leave the house in a minute man. But that's what I called to see if you wanna do that what you had did last time. Know what I'm

18

talking about?" HYATTE replied, "Yeah, yep" and EBERHARDT said, "Alright uh, fuck, uh, I'm saying I don't wanna pull up right there." and HYATTE asked, "What at the house?" and EBERHARDT told him, "Alright, look don't even trip I'll be over there just give me a minute or two I'll be over there."

37. Based on my training and experience, and knowledge acquired during the course of this investigation, in the above-referenced telephone call, EBERHARDT related that he was attempting to collect money before travelling to meet his source of supply. EBERHARDT then asked HYATTE if he wanted give money to EBERHARDT for EBERHARDT to obtain additional narcotics from his source of supply and HYATTE responded that he did.

38. At 1:48 a.m., surveillance located WESTMORELAND's black Infinity SUV at HYATTE's house parked in the driveway of 5216 Donlyn Lane, Chattanooga, Tennessee. At 1:57 a.m., surveillance followed WESTMORELAND's black Infinity SUV toward Atlanta, Georgia.

39. The vehicle was followed to Covington, Georgia and at approximately 5:10 a.m., Marlon EBERHARDT and WESTMORELAND were observed entering an Econo Lodge hotel in Conyers, Georgia. At approximately 7:45 a.m., EBERHARDT and WESTMORELAND were observed leaving the hotel and driving to Percy RICHA~~X~~RD's *wcw* residence. At that time, EBERHARDT was observed entering the residence.

40. The black Infiniti was later observed leaving RICHARD's residence and constant surveillance was maintained on the vehicle. At approximately 9:45 a.m., Georgia State Police officers conducted a traffic stop on the vehicle occupied by EBERHARDT and WESTMORELAND in Rockdale County, Georgia. The vehicle was stopped for speeding and window tint violation. Upon making contact with the occupants of the vehicle, the State Trooper

19

observed fresh track marks consistent with narcotics use on WESTMORELAND's arms.
WESTMORELAND also appeared to be nervous. WESTMORELAND was then asked if there
was any heroin in the vehicle and she replied that there was and subsequently removed
two packages from her groin area. The packages were later determined to contain
approximately 128 gross grams of suspected heroin and 84 gross grams of suspected
cocaine. The seized narcotics were subsequently sent to the DEA laboratory for testing
and analysis and the results are pending.

41. On July 26, 2016, a local search warrant was executed at RICHARD's residence, which
resulted in the seizure of approximately $248,580.00 in United States Currency, eight
ounces of heroin, six ounces of cocaine, drug paraphernalia, drug ledgers, and firearms.

### Additional Intercepted Communication Relating to Kevin Hyatte

42. On July 27, 2016, at approximately 5:36 p.m., Target Telephone #3 sent an outgoing text
message to telephone number 423-463-7533, utilized by HYATTE, stating, "Yeah what u
trying to do." Target Telephone #2 then received an incoming text message from the same
telephone number stating, "One of those." At approximately 7:09 p.m., Target Telephone
#3 sent outgoing text messages to telephone number 423-463-7533 stating, "Joe said he
finna come get the money and just give u the reup price which is $110 a G so ull get 2G. He
just has to meet dude on Aminicola after he leave ur" and "house." Agents believe that in
this message, Heather ROBINSON told HYATTE that Jovani ROBINSON would meet with
HYATTE at HYATTE's residence, 5216 Donlyn Lane #A, Hixson, Tennessee, to obtain his

money which Jovani ROBINSON would then take to obtain heroin from an unknown source of supply.

## CONCLUSION

43. In summary, agents of the Drug Enforcement Administration have been investigating and have obtained a substantial amount of information regarding the drug trafficking activities of Heather ROBINSON, Jovani ROBINSON, Marlon EBERHARDT, Kevin HYATTE and their associates. This investigation has revealed through verified confidential source information, law enforcement surveillance, the seizure of narcotics, and recorded telephone conversations that Heather ROBINSON, Jovani ROBINSON Marlon EBERHARDT, and Kevin HYATTE have been for some time and are still involved in the trafficking of significant amounts of heroin. Your Affiant further submits that there is probable cause to believe Kevin HYATTE utilized his residence located at 5216 Donlyn Lane #A, Hixson, Tennessee to facilitate his drug trafficking activity through the storage and sale of narcotics, and the storage and maintenance of records, cellular telephones, packaging material, and drug paraphernalia used in furtherance of his drug trafficking.

44. Your affiant submits that probable cause exists to have the residence/premise/property, to include any and all outbuildings and vehicles, located at 5216 Donlyn Lane #A, Hixson, Tennessee, in the Eastern District of Tennessee, searched for the items contained in Attachment B of this Affidavit.

21

<u>ATTACHMENT A</u>

**Description of the Residence/Premises/Property of Kevin HYATTE located at 5216 Donlyn Lane #A, Hixson, Tennessee**

The residence is single family home located at 5216 Donlyn Lane #A, Hixson, Tennessee. The residence is described as a single level duplex structure with brick and blue siding. The residence has a gray colored roof, black window shutters, and white window frames. The numbers "5216" appear on the front of the residence. There are two doors on the front of the residence. Unit A is located on the right side of the residence from the street and has a screen door in front of a white colored door. Unit B is located on the left side of the residence from the street and has a white door. The mailbox for Unit B is located on the street to the left of a broken mailbox.



**Items to Be Searched for at the Residence/Premises/Property of Kevin Hyatte located at 5216 Donlyn Lane #A, Hixson, Tennessee**

(1)     Books, photographs, records, receipts, notes, ledgers and other papers which show the transportation, ordering, purchase, distribution, possession, sale or manufacture of controlled substances;

(2)     Address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers, written or typed by hand as opposed to printed commercially;

(3)     Books, letters, records, computerized and electronic records, receipts, bank statements and records, money drafts, letters of credit, wire transfers, safe deposit box keys, money order and cashier's check receipts, passbooks, bank checks, and other items that reflect the expenditure, obtaining, secreting, transfer or concealment of drug proceeds;

(4)     United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, notes and other documents showing an accumulation of assets, wealth, or money to the extent that these items are found in such quantity, substance and/or quality as to permit a reasonable inference that such items are proceeds of drug trafficking;

(5)     Controlled substances, material and paraphernalia for manufacturing, packaging, cutting, weighing and distributing controlled substances, in particular heroin, marijuana, and cocaine, including, but not limited to scales, baggies, packing material;

(6)     Indicia of occupancy, residency, and/or ownership of the premises described above and other real property, including but not limited to deeds, utility and telephone bills, canceled envelopes and keys;

(7)     The visual image, by way of photography, of all furnishings and equipment in, on, under,

24

attached, or appurtenant to said premises;

(8)     Papers, tickets, notes, schedules, receipts and other documents relating to travel to and from drug source areas and drug distribution areas;

(9)     Firearms;

(10)    Cellular telephones, including the electronic address book, stored memory feature and the SIM card (or similar type of electronic data storage card) of the cellular telephone; and Pagers.

(11)    Any and all other material evidence of violations of 21 U.S.C. §§ 841(a)(1), 843(b), and 846, which include distribution of and possession with intent to distribute controlled substances, using a communication facility in facilitating the commission of a drug offense, and conspiracy to distribute/possess with intent to distribute controlled substances; and 18 U.S.C. § 1956, which includes money laundering.

_William C Wise_

Special Agent, William C. Wise
Drug Enforcement Administration

Sworn to and subscribed before me this
16th day of August 2016

Susan K. Lee
United States Magistrate Judge
Eastern District of Tennessee